UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number:  10-20783-CIV-MARTINEZ-BROWN**

ILEANA M. SALAZAR,

      Plaintiff,

vs.

DELTA HEALTH GROUP, INC., d/b/a
FOUNTAINHEAD CARE CENTER,

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING AS MOOT MOTIONS TO STRIKE

THIS CAUSE came before the Court upon Defendant Delta Health Group, Inc.'s Motion for Summary Judgment (D.E. No. 28), Defendant Delta Health Group Inc.'s Motion to Strike "Affidavits" filed by Plaintiff (D.E. No. 37), Plaintiff's Motion to Strike "Affidavit and Exhibits of Jim Williams" in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (D.E. No. 46), Defendant Delta Health Group, Inc.'s Motion to Strike Portions of Carmen Telot's Affidavit filed by Plaintiff in Support of Response to Defendant's Motion for Summary Judgment (D.E. No. 60), and Defendant Delta Health Group, Inc.'s Motion to Strike Affidavit of Naira Padron Filed By Plaintiff in Support of Response to Defendant's Motion for Summary Judgment (D.E. No. 61).

Plaintiff Ileana M. Salazar ("Plaintiff" or "Salazar") has filed suit against Defendant Delta Health Group, Inc. d/b/a Fountainhead Care Center ("Defendant" or "Delta"), alleging violations of  42 U.S.C. § 1981, the Florida Civil Rights Act of 1992, Fla. Stat. § 760 *et seq*. ("FCRA"), the

Florida Whistleblower Act, Fla. Stat. § 448.101 *et seq*., state tort law, and the Consolidation

Omnibus Reconciliation Act ("COBRA"), 29 U.S.C. § 1166.  Defendant Delta has moved for

summary judgment on all claims asserted against it, excepting Plaintiff's claim in Count VIII for

negligent hiring, retention, and training.[1]  The parties have also filed four motions to strike

relating to documents filed in support of the motion for summary judgment or the response to the

motion for summary judgment.  After careful consideration and for the reasons set forth below,

the Court grants in part and denies in part Defendant's motion for summary judgment and denies

the motions to strike as moot.

### I.        Relevant Factual and Procedural Background[2]

Plaintiff is white and was born in Cuba. (D.E. No. 34-1, Salazar Depo. at 158).   She was

employed as a social worker and abuse coordinator at Fountainhead Care Center

("Fountainhead"),[3] a skilled nursing facility in North Miami, from April 2004 until September

19, 2008.  (D.E. No. 34-1, Salazar Depo. at 22, 27); (D.E. No. 66, Joint Pretrial Stipulation at 4).

From the time Plaintiff was hired in 2004 until April 2008, Carmen Telot ("Telot") was the

administrator of Fountainhead and Plaintiff's immediate supervisor.  (D.E. No. 34-1, Salazar

---

[1]Defendant states in its motion that it is moving for summary judgment on all claims Plaintiff has asserted, and Plaintiff includes a heading stating that "Salazar's allegations are insufficient to support the claims of a hostile work environment as alleged in Counts I-VIII." (D.E. No. 28 at 8).  There is, however, no hostile work environment claim in Count VIII.  Count VIII contains a claim for negligent hiring, retention, and training, and Defendant has not included any argument as to why summary judgment should be granted in its favor on this claim.  Thus, this Court does not address this claim.

[2]Where there is a dispute of fact, the facts have been stated in the light most favorable to the non-moving party, Plaintiff Salazar.

[3]Here, Plaintiff has filed this suit against Delta doing business as Fountainhead.

Depo. at 8); (D.E. No. 66, Joint Pretrial Stipulation at 4).  Plaintiff's problems at work did not

start until April 2008, which was shortly after Telot resigned.  (D.E. No. 66, Joint Pretrial

Stipulation at 4).

      After Telot resigned, a replacement administrator was not immediately hired.  The

Director of Nursing, Brenith Delson ("Delson"), was appointed as the acting administrator, and

the Director of Operations, Mikki Meer ("Meer"), stated that she would be coming by

Fountainhead two or three times a week to check on the facility.[4] (D.E. No. 34-1, Salazar Depo.

at 36).  Delson was already working at Fountainhead in 2004 when Plaintiff was hired, and

Plaintiff testified that up until this point in April 2008 she had a good relationship with Delson.

*Id.* at 21, 37.

      Plaintiff testified that things changed shortly after Delson was appointed as the acting

administrator.  *Id*. at 37. Specifically, Plaintiff states that Delson asked her to start filling out

certain transportation forms for every patient in the facility in an apparent attempt to get

reimbursement for the cost to transport a patient to a doctor's appointment or to the hospital.  *Id*.

at 37-38.  Plaintiff states that not everyone qualified for these services, and she felt it would be

committing fraud to fill out these forms.  *Id*. at 38-39.  Thus, Plaintiff refused to fill out these

forms and informed Dr. Gonzalez, who would be signing off on these forms, that she thought it

was inappropriate to fill out forms for every patient.  *Id*. at 39-43.  Dr. Gonzalez then spoke to

Delson and told her that he would not be signing any transportation forms unless he filled them

---

    [4]It is not entirely clear from Delson's deposition testimony on this issue, but it appears
that Delson disagrees that she was the acting administrator.  *See* (D.E. No. 64-1, Delson Depo. at
41-83).  She does, however, admit that she was second in command when Meer was not at
Fountainhead. *Id*. at 83. Regardless, taking the facts in the light most favorable to Plaintiff, the
Court considers the facts as if Delson was the acting administrator.

out himself. *Id.* at 43. Plaintiff also states that she began bringing instances of abuse and neglect at Fountainhead to Delson's attention and that after this "everything went down hill," and Delson started "harassing . . .[her], humiliating . . . [her], discriminating . . . [against her], demoralizing . . . [her] to the point . . . [where she thought she would] have a stroke or heart attack." *Id.* at 44. Plaintiff testified that when she got up in the mornings it was as if she "was going to war and . . . [she] really . . . [doesn't] know how . . .[she] survived." *Id.* at 56.

Plaintiff alleges that the following specific instances occurred.

1.  One day after the morning meeting Delson asked Plaintiff if she was stupid and called her a "crazy Cuban." (D.E. No. 34-1, Salazar Depo. at 49).

2.  During a morning meeting, Delson said to Plaintiff's assistant, Winchell Oliver ("Oliver"), that she wanted Natasha Gerrick, another social worker, to train Oliver because "she's an excellent social worker" implying to Plaintiff that Plaintiff didn't know what she was doing. *Id.* at 49.

3.  During a morning meeting, Delson accused Plaintiff of not getting bank statements from a particular patient although Plaintiff states that she had tried to get the bank statements and that it was not even her job to get said statements. *Id.* at 49-50. Delson also called Plaintiff a liar in relation to this discussion regarding the bank statements. *Id.* at 54-55.

4.  During another meeting where Meer was present, Plaintiff began crying and Delson said "Oh, look at those Cuban crocodile tears." *Id.* at 59.[5]

5.  One morning Delson told Plaintiff that "she didn't know how . . .[Plaintiff] had said . . .[she] grew [up] in this country when . . . [she] had a very strong accent in . . . [her] English." *Id.* at 60.

6.  Another time Delson said when she was reviewing charts that Plaintiff's "grammar was terrible and that she could not understand . . . [her] handwriting." *Id.* at 60.

---

[5] Plaintiff also states with regard to this statement that "it was not the first time" Delson said this. (D.E. No. 34-1, Salazar Depo. at 59). There, is, however, no indication when or how often Delson said this before. Thus, as Plaintiff has not met her burden on summary judgment of bringing forth specific evidence on this issue, the Court considers this as one incident.

7.      Plaintiff states that Delson told her not to speak Spanish at work although Haitian workers were allowed to speak Creole.  *Id*. at 125.[6]

Plaintiff also states that in general "[t]hey were pushing me against the wall and overloading me with [the] work of two and three people."  *Id*. at 91. Plaintiff also alleges that her assistant was fired.

Plaintiff states that she complained about Delson's treatment of her to Meer on multiple occasions.  *Id*. at 50.  She gave Meer a letter detailing Delson's conduct on May 12, 2008.  *Id*. Plaintiff also had a meeting with Meer and Delson regarding her problems with Delson.  *Id*. at 59-60.  A new administrator, Padma Lewis Marks ("Marks"), was appointed at the end of May, 2008, and Plaintiff states that she also complained to Marks about her situation with Delson three or four days after Marks started working at Fountainhead.  *Id*. at 61-62.

On June 12, 2008, Plaintiff was written up twice by Marks for being discourteous to Delson.  *Id*. at 62-64.  In response, Plaintiff wrote two letters disputing these write-ups and describing the alleged harassment she believed she was suffering at the hands of Delson.  *Id*. at 86-87.  Over the period from April to September, Plaintiff made a number of written complaints. (D.E. No. 53, Exhs. 1, 2, 3, 4, 5, 6, 7, 8, and 17).  Plaintiff wrote and gave one letter to her supervisor, Marks, three days before she was terminated. (D.E. No. 53, Exh. 17) (memo dated September 16, 2008). The only written complaints, however, that used the word "discrimination" are both dated June 12, 2008.[7]  (D.E. No. 34-1, Salazar Depo. at 129-133); (D.E. No. 53, Exhs. 2,

_____

[6]Plaintiff states that Delson was the only one who ever made offensive or derogatory remarks regarding her race or her nationality.  *Id*. at 136.

[7]Exhibit 8 has a date on the first page of June 11, 2008 but at the end, the date of June 12, 2008 appears.  (D.E. No. 53, Exh. 8).  It appears that it was actually written on June 12, 2008 as it references the write-ups that occurred on June 12, 2008.

8).[8]  Plaintiff, however, never specifically wrote in any of her written complaints that she was

being discriminated against because she was a white Cuban.  (D.E. No. 34-1, Salazar Depo. at

129-131).

In early August, Plaintiff was told that she needed to start completing "MDS" care plans

for patients on the computer.  *Id*. at 90.  MDS is a "Minimum Data Set" that is prepared for each

patient.  It records the medication a patient is receiving and any other changes in the patient.  *Id*.

at 26.  For example, the MDS would show if the patient came to the facility alert but over the

years developed a handicap.  *Id*.  Mikki Meer also testified that "MDS" is a "Minimal Data Set"

and it is "an overview of a resident's needs for a specific period of time."  (D.E. No. 31-1, Meer

Depo. at 54).  Although Plaintiff states that Marks spoke with her about how to complete the

MDS care plans, she states that no one ever trained her with a computer in front of her.  (D.E.

No. 34-1, Salazar Depo. at 98-99).

On September 5, 2008, Plaintiff was advised in a letter that she was being placed on an

action plan.  *Id*. at 99; (D.E. No. 35-1).  Marks testified that Plaintiff was placed on this action

plan based on her poor performance in a number of areas. (D.E. No. 32-1, Marks Depo. at 49,

101-102); *see also* (D.E. No. 35-1 at 30).  An action plan sets forth certain goals to be achieved

by a certain date.  *Id*. at 159.  Specifically, this action plan stated that Plaintiff had a period of

sixty days to meet a number of listed goals, including the completion of MDS care plans.  (D.E.

---

[8]Specifically, in a memo to Marks and Meer dated June 12, 2008, Plaintiff states that "I
have decided to provide you with this letter since I can no longer take the daily harassment, lack
of respect, the verbal abuse towards me in front of other co-workers, discrimination, abusive
actions, emotional abuse and mental anguish caused and done by Mrs. Bernith [sic] Delson
(DON)."  (D.E. No. 53, Exh. 8 at 1).   In the statement dated June 12, 2008, Plaintiff wrote on a
write-up she received from Marks that she felt the situation which gave rise to the write-up was
"a discrimination situation, caused by Mrs. Delson."  (D.E. No. 53, Exh. 2 at 3).

No. 35-1 at 30).[9]

Plaintiff testified that no one had a follow-up meeting with her about this action plan until September 17, 2008. (D.E. No. 34-1, Salazar Depo. at 103-104, 106).  On September 17, 2008, Plaintiff met with Marks and Meer to discuss her action plan.  *Id*.  Specifically, Plaintiff had not met the goal of completing the MDS care plans.[10] (D.E. No. 32-1, Marks Depo. at 45, 166-167). Marks testified that at this meeting Plaintiff asked to leave, stating that she was sick.  *Id*. at 167. Marks testified that neither she nor Meer responded to Plaintiff's request to leave and that Plaintiff simply got up and left.  *Id*.   In contrast, Plaintiff testified that she was given permission to leave the meeting because she was feeling ill.  (D.E. No. 34-1, Salazar Depo. at 106-109).

 Plaintiff was suspended for walking out on the meeting and then Plaintiff was terminated two days later on September 19, 2008[11] for poor performance and/or walking out of the meeting. (D.E. No. 32-1, Marks Depo. at 167-168, 175-176); (D.E. No. 31-1, Meer Depo. at 111).  Marks testified that Plaintiff was terminated for poor performance.  (D.E. No. 32-1, Marks Depo. at 167-168, 175-176).  Meer testified that Plaintiff was terminated for failing to complete the action plan and because she walked out of the meeting.  (D.E. No. 31-1, Meer Depo. at 111).  After Plaintiff was terminated, she was replaced by a non-white woman.  (D.E. No. 47-1, Hernandez Depo. at 25).[12]  Plaintiff testified that after she was terminated "her health insurance was

---

[9]At some point before September 10, 2008, Delson resigned.  (D.E. No. 53, Exh. 15).

[10]It is not clear if Plaintiff had also failed to meet other goals on the action plan.

[11]It is undisputed that Plaintiff was terminated on September 19, 2008.  (D.E. No. 66, Joint Pretrial Stipulation at 4).

[12]Evangelio Martinez Hernandez works as a housekeeper at Fountainhead.  (D.E. No. 47-1, Hernandez Depo. at 6).  She testified that after Plaintiff was dismissed she was "temporarily

-7-

cancelled" and "[n]o Cobra was offered and nothing."  (D.E. No. 34-1, Salazar Depo. at 142).

On March 16, 2010, Plaintiff filed this action against Delta.  The operative complaint is Plaintiff's ten-count Amended Complaint.  *See* (D.E. No. 13-1).  In Counts I, II, and III, Plaintiff has alleged violations of section 1981, for discrimination based on national origin, discrimination based on race, and unlawful retaliation respectively.  In Counts IV, V, and VI, Plaintiff has alleged the same violations of the FCRA.  In Counts VII and VIII, Plaintiff has alleged tort violations, including intentional infliction of emotional distress and negligent hiring, retention, and training.  In Count IX, Plaintiff has alleged a violation of the Florida Whistleblower Act, and finally, in Count X, Plaintiff has alleged a violation of COBRA, 29 U.S.C § 1166.  Defendant Delta has moved for summary judgment on all of these claims, excepting Count VIII.

## II.    Summary Judgment Legal Standard

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find

---

replaced by a colored woman." *Id*. at 25.  Viewing this evidence in the light most favorable to the non-moving party, the Court infers that Hernandez means a non-white woman.

for the non-moving party. *Anderson*, 477 U.S. at 248; *Matsushita Electric Indus. Co.,* 475 U.S. at 586. It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248. In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Id.* at 255.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991). The moving party "'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)). *See also* Fed. R. Civ. P. 56(e).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim." *Id.* at 323 (emphasis in original). The moving party may discharge its burden

in this situation by showing the Court that "there is an absence of evidence to support the

nonmoving party's case."  *Id*. at 324.  Once the moving party discharges its initial burden, a non-

moving party who bears the burden of proof must "go beyond the pleadings and by [its] own

affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate

'specific facts showing that there is a genuine issue for trial.'"  *Id*. (quoting Fed. R. Civ. P. 56(e)).

A non-moving party "may not rest upon the mere allegations or denials of the adverse party's

pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

Fed. R. Civ. P. 56(e).

### III.     Summary Judgment Analysis

Defendant Delta seeks summary judgment on all claims asserted against it, excepting

Count VIII.  The Court finds Delta's motion should be granted in part and denied in part.

### A.     Section 1981 and FCRA (Counts I, II, III, IV, V and VI)

First, Defendant moves for summary judgment on Plaintiff's claims for race and national

origin discrimination brought pursuant to 42 U.S.C. § 1981 and the FCRA.[13]  Section 1981(a)

provides that

> All persons within the jurisdiction of the United States shall have the same right in
> every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the security of persons
> and property as is enjoyed by white citizens, and shall be subject to like punishment, pains,
> penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  First, the Court notes that it is well-established that claims based solely on

---

[13]Because both section 1981 and FCRA are analyzed under the same framework, unless
otherwise specified, the Court discusses these claims together and only makes specific reference
to section 1981.  *See Dalmau v. Vicao Aerea Rio Grandense, S.A.*, 337 F. Supp. 2d 1299, 1305
n.1 (S.D. Fla. 2004).

national origin are not cognizable under section 1981. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Bullard v. OMI Georgia, Inc*., 640 F.2d 632, 634 (5th Cir. 1981).[14]  Thus, Count I is dismissed.[15]  Plaintiff, however, has also alleged racial discrimination under section 1981 and race and national origin discrimination under FCRA.[16] Defendant argues that Plaintiff cannot establish a prima facie case of discrimination, that Plaintiff cannot demonstrate that its proffered reasons for her termination were a pretext, that Plaintiff cannot demonstrate that she was subjected to a hostile work environment, and that Plaintiff cannot demonstrate retaliation.  After careful consideration, the Court finds summary judgment is appropriate on Plaintiff's hostile work environment claims and on her claims for retaliation. The Court, however, denies Defendant's motion with regard to Plaintiff's other civil rights' claims.

### 1.    Prima Facie Case and Pretext

Defendant has moved for summary judgment, arguing that Plaintiff cannot demonstrate a prima facie case and that she cannot show that the reasons for her termination were a pretext for discrimination.  Neither party argues that this case involves direct evidence of discrimination. Where there is no direct evidence of discrimination, a plaintiff demonstrates discrimination through circumstantial evidence under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F. 3d

---

[14]In *Bonner v. Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[15]Defendant has not raised this argument, however, the Court cannot as a matter of law allow this claim to proceed.

[16]The FCRA claim based on national origin remains pending as a national origin claim is cognizable under FCRA.  Fla. Stat. § 760.01(2).

1318, 1330 (11th Cir. 1998) (stating that both Title VII and section 1981 "have the same requirements of proof and use the same analytical framework"); *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998) ("Florida courts have held that decisions construing Title VII are applicable when considering claims under the Florida Civil Rights Act, because the Florida Act was patterned after Title VII."). Once a plaintiff meets her burden and demonstrates a prima facie case, the burden shifts to the defendant to offer a nondiscriminatory reason for the adverse employment action. *Id.* If a nondiscriminatory reasons is offered, the burden shifts back to the plaintiff to show that the employer's proffered reason for the adverse employment action was merely a pretext for discrimination. *Id.* In this case, Defendant has argued that Plaintiff cannot demonstrate a prima facie case and that Plaintiff cannot demonstrate that their proffered reason for her termination was a pretext. The Court finds both of these arguments are without merit.

### a.    Prima Facie Case

To establish a prima facie case Plaintiff must demonstrate that (1) she is a member of a protected class, (2)  she was qualified for the job, (3) she suffered an adverse employment action, and (4) she was replaced by someone outside of her protected class. *Cuddleback v. Fla. Bd. of Educ.*, 381 F. 3d 1230, 1235 (11th Cir. 2004). First, Defendant argues that Plaintiff cannot demonstrate a prima facie case because Plaintiff cannot demonstrate that she suffered an adverse employment action and because she cannot demonstrate that similarly situated employees outside of Plaintiff's protected class were treated differently. First, it is unclear why Defendant argues that Plaintiff cannot demonstrate an adverse employment action as it is undisputed that Plaintiff was terminated on September 19, 2008. (D.E. No. 66, Joint Pretrial Stipulation at 4). Moreover,

Defendant's argument that Plaintiff cannot demonstrate that similarly situated employees outside of her protected class were treated differently is without merit.  Plaintiff may satisfy her burden by demonstrating that after she was terminated she was replaced by someone outside of her protected class.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (stating that Reeves demonstrated a prima facie case for his ADEA where he demonstrated that three persons outside of his class were hired to fill his position).  Here, Plaintiff has offered evidence that she is a white Cuban and that after she was terminated she was replaced by a non-white woman (D.E. No. 34-1, Salazar Depo. at 135); (D.E. No. 47-1, Hernandez Depo. at 25).  Thus, genuine issues of material fact remain with regard to Plaintiff's prima facie case.

### b.      Pretext

Next, Defendant argues that it is entitled to summary judgment because Plaintiff cannot demonstrate that its proffered reason for her termination is a mere pretext.  Defendant's burden to articulate a non-discriminatory reason for Plaintiff's termination is "exceedingly light."  *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983).  It is "a burden of production, not of persuasion."  *Vessels v. Atlanta, Independent School Sys.*, 408 F.3d 763, 770 (11th Cir. 2005).  Once the defendant employer meets this burden, "[t]o survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination."  *Id.* at 771.  "This evidence must reveal 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.'"  *Id.* (quoting *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir. 2004)).

-13-

Defendant has offered evidence that Plaintiff was terminated for poor performance and because she walked out of a meeting. (D.E. No. 31-1, Meer Depo. at 172); (D.E. No. 33-1, Marks Depo. at 175-76). Plaintiff's immediate supervisor, Padma Lewis Marks testified that Plaintiff was fired because she did not complete her action plan. (D.E. No. 32-1, Marks Depo. at 49, 99-100). Marks testified that Plaintiff was put on an action plan due to her poor performance on September 5, 2008. *Id*. at 101-102. An action plan sets forth certain goals to be achieved by a certain date. *Id*. at 159. Marks held a meeting with Plaintiff and Mikki Meer, Defendant's Director of Operations, on September 17, 2008 to address the action plan. *Id*. at 45, 166-167. Specifically, Plaintiff had not met the goal of completing the MDS care plan. *Id*. Marks testified that at this meeting Plaintiff asked to leave stating that she was sick. *Id*. at 167. Marks testified that neither she nor Meer responded to Plaintiff's request to leave before she simply left. *Id*. Plaintiff was suspended for walking out on the meeting and then Marks testified that she was terminated two days later for poor performance. *Id*. at 167-168, 175-176. Meer testified that Plaintiff was terminated for failing to complete the action plan and because she walked out of the meeting. (D.E. No. 31-1, Meer Depo. at 111).

Plaintiff argues that these proffered reasons are merely a pretext for discrimination because in the four years before this she had excellent performance reviews, the MDS work was not assigned to her until August of 2008 which set her up for termination one month later, Plaintiff was never properly trained to complete the MDS work, Plaintiff was never given the opportunity to correct the alleged deficiencies in her work, and contrary to "the policy and protocol of the company to afford an employee on an 'action plan' 60 days to correct any deficiencies" she was fired fourteen days after her action plan began. (D.E. No. 63 at 13). The Court finds the majority

-14-

of Plaintiff's arguments are immaterial, however, there is a genuine dispute of fact as to whether Defendant's proffered reasons are a mere pretext for discrimination.

First, with regard to Plaintiff walking out of the meeting without permission, Plaintiff testified that she was given permission to leave the meeting because she was feeling ill.  (D.E. No. 34-1, Salazar Depo. at 106-109).  Next, with regard to Defendant's statement that Plaintiff was terminated for her inability to complete the action plan, the action plan itself states that Plaintiff has a period of sixty days to meet a number of listed goals, including the completion of MDS care plans.  (D.E. No. 35-1 at 30).  Here, it is undisputed that Plaintiff was fired a mere fourteen days after the action plan was put into place.  Therefore, according to Plaintiff's testimony, she had permission to leave the meeting but was nevertheless terminated and she was supposed to still have forty-six days to complete her action plan goals.

Viewing the record in the light most favorable to Plaintiff there are inconsistencies in the record with regard to Defendant's proffered reasons for Plaintiff's termination.  These inconsistencies coupled with the evidence in the record which establishes Plaintiff's prima facie case, as discussed above, meets Plaintiff's burden on summary judgment.  Thus, the Court denies Defendant's motion on this ground.

### 2.   Hostile Work Environment

Defendant also moves for summary judgment on Plaintiff's hostile work environment claims.  "A hostile work environment claim . . . is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F. 3d 1269, 1275 (11th Cir. 2002)[17]

(quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  To support a hostile work

environment claim, Plaintiff must demonstrate that

> (1) [s]he belongs to a protected group; (2) [s]he was subjected to unwelcome
> harassment; (3) the harassment was based on . . . [her] membership in the protected
> group; (4) it was severe or pervasive enough to alter the terms and conditions of
> employment and create a hostile or abusive working environment; and (5) the
> employer is responsible for that environment under a theory of either vicarious or
> direct liability.

*Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010).  Defendant argues that it is entitled

to summary judgment on this claim because Plaintiff cannot demonstrate that any alleged

harassment was sufficiently severe or pervasive under the fourth element.

Determining whether harassing conduct is "sufficiently severe or pervasive to alter an

employee's terms or conditions of employment includes a subjective and objective component."

*Mendoza v. Borden, Inc.*, 195 F. 3d 1238, 1246 (11th Cir. 1999).  "The employee must

'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or

conditions of employment, and this subjective perception must be objectively reasonable." *Id.*

(quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Viewing the facts in the light most

favorable to Plaintiff, she subjectively perceived the alleged harassment to be so severe or

pervasive to alter a term or condition of her employment.  *See Smith v. Norwest Fin. Acceptance,

Inc.*, 129 F. 3d 1408, 1413 (10th Cir. 1998) (finding that the fact that plaintiff was humiliated and

upset by her supervisor's hostile remarks satisfied the subjective component).  The Court,

---

[17]This is a Title VII case, however, Title VII and section 1981 hostile work environment
claims have the same elements and are subject to the same analysis.  *Shields v. Fort James Corp.*,
305 F. 3d 1290, 1282 (11th Cir. 2002).

however, finds that no genuine issues of material fact remain that such perception was not objectively reasonable.

In assessing whether the alleged harassment objectively altered an employee's terms or conditions of employment, the court considers a number of factors.  These factors include: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  *Mendoza*, 195 F. 3d at 1246.  The Court considers each of these factors but acknowledges that these factors should not be viewed in isolation but under the totality of the circumstances to determine if the harassment is actionable. *Id*.

First, there are seven specific instances where Plaintiff alleges that she was harassed.

1.  One day after the morning meeting Delson asked Plaintiff if she was stupid and called her a "crazy Cuban." (D.E. No. 34-1, Salazar Depo at 49).

2.  During a morning meeting, Delson said to Plaintiff's assistant, Winchell Oliver ("Oliver"), that she wanted Natasha Gerrick, another social worker, to train Oliver because "she's an excellent social worker" implying to Plaintiff that Plaintiff didn't know what she was doing.  *Id*. at 49.

3.  During a morning meeting, Delson accused Plaintiff of not getting bank statements from a particular patient although Plaintiff states that she had tried to get the bank statements and that it was not even her job to get said statements.  *Id*. at 49-50. Delson also called Plaintiff a liar in relation to this discussion regarding the bank statements.  *Id*. at 54-55.

4.  During another meeting where Meer was present Plaintiff began crying and Delson said "Oh, look at those Cuban crocodile tears."  *Id*. at 59.

5.  One morning Delson told Plaintiff that "she didn't know how . . .[Plaintiff] had said . . .[she] grew [up] in this country when . . . [she] had a very strong accent in . . . [her] English."  *Id*. at 60.

-17-

6.  Another time Delson said when she was reviewing charts that Plaintiff's "grammar was terrible and that she could not understand . . . [her] handwriting."  *Id*. at 60.

7.  Plaintiff states that Delson told her not to speak Spanish at work although Haitian workers were allowed to speak Creole.  *Id*. at 125.[18]

Plaintiff also states that in general "[t]hey were pushing me against the wall and overloading me with [the] work of two and three people."  *Id*. at 91.  She also alleges that her assistant was fired.

In order to demonstrate a hostile work environment, Plaintiff must show harassing conduct based upon her protected class.  The incident where Delson implied in Plaintiff's view that Natasha Gerrick was a better social worker and Plaintiff didn't know what she was doing, the incident relating to the bank statements and Delson calling Plaintiff a liar, Plaintiff's general statement that she received too much work, and the fact that her assistant was fired are not race-based conduct or statements.  Plaintiff has not offered any evidence that this alleged conduct was based on her membership in any protected group.  Thus, the Court does not consider these two specific instances and Plaintiff's general complaints in analyzing Plaintiff's hostile work environment claim.  *See Buckhanon v. Huff & Associates Const. Co., Inc*., 506 F. Supp. 2d 958, 966 n.1 (M.D. Ala. 2007) (stating that "[i]n order to overcome the heavy burden of summary judgment in a Title VII and section 1981 action, plaintiffs must point to *specific* instances of racial hostility and not offer mere conclusory allegations.").

The Court now considers the frequency of the race and/or national origin based comments made by Delson.  There are five specific comments made by Delson over the five-month period from April 2008 until Plaintiff's termination in September 2008.  Because the incidents occurred

---

[18]Plaintiff states that Delson was the only one who ever made offensive or derogatory remarks regarding her race or her nationality.  *Id*. at 136.

with limited frequency, this factor weighs against Plaintiff.  *See e.g.*, *Njie v. Regions Bank*, 198

Fed. Appx. 878, 880, 883-884 (11th Cir. 2006) (finding that plaintiff, an African American

female, had failed to demonstrate that the alleged harassment was sufficiently pervasive where

over a two month period another employee made "racial slurs on several occasions and used "the

words 'token' and 'quota.'").[19]

Next, the Court also finds that the severity factor weighs against Plaintiff.  As stated

above, Plaintiff has alleged only five comments that could possibly be regarded as race and/or

national origin specific over a five month period.  Two of these comments consisted of Delson

using the term "Cuban" calling Plaintiff a "crazy Cuban" and describing Plaintiff's tears as

"Cuban crocodile tears."  The other two comments related to Plaintiff's English language abilities.

More specifically, Delson commented on Plaintiff's accent and her grammar.  Finally, Delson also

told Plaintiff not to speak Spanish.  These are not severe comments.  No racial slurs were used,

and no offensive physical conduct has been alleged.  At most, Delson inappropriately referred to

Plaintiff's nationality, insulted Plaintiff's proficiency in the English language, and told Plaintiff

not to speak Spanish.   Although these utterances may be offensive, they do not rise to the level of

severe comments that create a hostile work environment. *See Rio v. Runyon*, 972 F. Supp. 1446,

1460 (S.D. Fla. 1997) (stating that "occasionally made adolescent, rude or insensitive comments

---

[19]The Court acknowledges that Plaintiff states in her deposition that there were "plenty" of other specific examples of race and/or national origin discrimination, but that she couldn't recall them right then.  (D.E. No. 34-1, Salazar Depo. at 135).  However, this statement is conclusory and not specific enough to create a genuine issue of material fact.  *See Leigh v. Warner Bros., Inc.*, 212 F. 3d 1210, 1217 (11th Cir. 2000) (finding that "conclusory allegations without specific supporting facts have no probative value" and noting that a party resisting "summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial.") (internal quotation marks deleted).

about Plaintiff" did not create a hostile work environment).

The Court next considers the third factor, whether the alleged conduct was physically threatening or humiliating.  Nothing occurred in this case which was physically threatening.  The five comments were arguably humiliating but more because Plaintiff was being personally criticized than because she was being attacked based on her race or national origin.  The Court, however, will find that this factor weighs at least slightly in Plaintiff's favor.

Finally, the Court considers whether Delson's comments unreasonably interfered with Plaintiff's work performance.  Plaintiff offers testimony that the situation at work upset her and that she sought medical treatment.  (D.E. No. 34-1, Salazar Depo. at 44, 56, 145-147, 149).  There is also a letter from her doctor, Dr. Neil Furman, in the record that states that beginning in May 2008 Plaintiff started having increased stress and anxiety relating to problems she was having at work.  (D.E. No. 35-1 at 52). This resulted in abdominal pain, headaches, dizziness, and an increase in her blood pressure.  *Id*.  Dr. Furman placed Plaintiff on antidepressants and states that at least twice Plaintiff was unable to go to work because of her symptoms.  *Id*.  Thus, there is evidence that the situation at work at least to some degree interfered with Plaintiff's ability to work.

Plaintiff, however, has not offered any evidence that Delson's comments specifically interfered with her ability to perform her job on an objective level.  *See Oestreich v. Wal-Mart Stores East LP*, No. 06-CV-242-SPM/AK, 2009 WL 890729, at *4 (N.D. Fla. 2009) (stating "[i]t is insufficient as a matter of law that Plaintiff was personally offended by the alleged jokes and whispers of his co-workers or that their behavior was otherwise 'subjectively abusive' unless he also shows that a 'reasonable person' would likewise have found the incidents . . . objectively

hostile or abusive.").  There is no evidence that Delson's comments which were neither severe nor frequent would have interfered with a reasonable person's work performance.  Thus, even if there is some evidence in Plaintiff's favor as to this factor, it is of questionable significance.

Considering the totality of the circumstances and all of the factors, the Court finds that the conduct at issue in this case was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and to create a discriminatorily abusive environment.  While Delson's comments may have been inappropriate, they were neither frequent nor severe and are not sufficient to create a hostile work environment.  Thus, to the extent Plaintiff alleges a hostile work environment claim in Counts II, IV, and V, this Court grants summary judgment in Defendant's favor on these claims.

### 3.     Retaliation

Finally, Defendant moves for summary judgment on Plaintiff's retaliation claims, arguing that Plaintiff cannot show that Defendant "failed to perform a contractual obligation or that any negative interaction between . . . [Defendant and Plaintiff] resulted from a racially discriminatory animus."  (D.E. No. 28 at 6).[20]  Defendant also argues that Plaintiff cannot state a prima facie case for retaliation.  *See* (D.E. No. 28 at 12).  First, it is well-established that a claim of post-hiring race discrimination such as the retaliation claim at issue in this case is cognizable under section 1981.  *CBOS West, Inc. v. Humphries,* 553 U.S. 442, 456 (2008).  The Court, however, finds that Plaintiff cannot demonstrate a prima facie case of retaliation and summary judgment is appropriate.

---

[20]This appears to be an argument that Plaintiff's retaliation claim is not cognizable under section 1981.

In order to demonstrate a prima facie case for retaliation under section 1981, "a plaintiff must prove that "[s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

First, with regard to Plaintiff's requirement to show that she engaged in protected activity, a retaliation claim under section 1981 "requires that the protected activity involve the assertion of rights encompassed by the statute." *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311 (11th Cir. 2010). Here, there is evidence in the record that Plaintiff verbally complained about her problems with Delson to Meer, the director of operations, and Marks, the new administrator. (D.E. No. 34-1, Salazar Depo. at 50-53, 61-62). It is not clear from the record whether when Plaintiff verbally complained she disclosed that she felt she was being discriminated against based on her race or national origin. Plaintiff did not testify specifically with regard to what she told Meer and Marks. *See id*. Plaintiff also made a number of written complaints. *Id*. at 53, 78-80, 87, 112; (D.E. No. 53, Exhs. 1, 2, 3, 4, 5, 6, 7, 8, and 17). The only written complaints, however, that used the word "discrimination" are both dated June 12, 2008.[21] (D.E. No. 34-1, Salazar Depo. at 129-133); (D.E. No. 53, Exhs. 2, 8).[22] Moreover, none of these written complaints state or even imply that Plaintiff felt she was being discriminated against because of her race or national origin. Thus, Plaintiff has failed to produce any evidence to demonstrate that she complained about the type of discrimination protected by section 1981 or FCRA, and thus, there is no evidence Plaintiff engaged in protected activity. *See Duncan v. Madison County*, No. 3:05-cv-

[21] *See supra* note 7.

[22] *See supra* note 8.

-22-

93, 2007 WL 2874803, at *7 (M.D. Ga. Sept. 27, 2007) (where the plaintiff complained about harassment but failed to state that such harassment was based on her gender or that such harassment violated Title VII and the court found that she failed to provided "any evidence that she engaged in statutorily protected activity, and . . . failed to establish her prima facie case of retaliation under Title VII.")

In addition, even if the Court could construe Plaintiff's June 12, 2008 written complaints that state that Delson discriminated against Plaintiff as sufficient to demonstrate that Plaintiff engaged in protected activity, there is no evidence that Plaintiff's complaints are causally connected to her termination on September 19, 2008.  Although temporal proximity may demonstrate a causal connection in some cases, *see Brungart v. BellSouth Telecommunications, Inc.*, 231 F. 3d 791, 799 (11th Cir. 2000), Plaintiff's termination occurred over three months after her complaints that stated the word "discrimination."  This timeline is not sufficient to demonstrate a causal connection.  *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (holding that three months between a protected activity and an adverse employment action was insufficient to establish a causal connection for a claim of retaliatory discharge under the FMLA, ADEA, and FCRA).   Thus, the Court also grants summary judgment on this claim.

**B.**      **Intentional Infliction of Emotional Distress (Count VII)**

Defendant also argues that Plaintiff cannot establish her claim in Count VII for intentional infliction of emotional distress.  "To prove intentional infliction of emotional distress under Florida law, the plaintiff must prove: (1) deliberate or reckless infliction of mental suffering; (2) by outrageous conduct; (3) which conduct must have caused the suffering; and (4) the suffering must have been severe." *Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990).  Defendant

argues that Plaintiff cannot prove that the conduct at issue was sufficiently outrageous.  This Court agrees, finding no genuine issues of material fact remain as to this issue.

For purposes of demonstrating intentional infliction of emotional distress, outrageous conduct is conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985). Under Florida law, the test for determining if conduct rises to the level of intentional infliction of emotional distress is an objective one. *Gillis v. Sports Authority, Inc.*, 123 F.Supp.2d 611, 616 (S.D.Fla.2000).  Plaintiff's allegations as to the conduct that gave rise to her claim for intentional infliction of emotional distress are detailed in the Court's fact section and in its discussion of Plaintiff's hostile work environment claim.  The Court finds that taking these allegations as true they do not rise to the level of outrageousness required to demonstrate intentional infliction of emotional distress. *See Vance v. Southern Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1574 n.2 & 1575 n.7,  (11th Cir. 1993) (upholding dismissal of plaintiff's state law claim for intentional infliction of emotional distress because the alleged conduct was not sufficiently outrageous where plaintiff alleged racial harassment which included, among other allegations, hanging a noose over her desk, suspending plaintiff for an offense where white employees who committed the same offense were not suspended, subjecting plaintiff to a physical altercation with a white co-worker and then only disciplining plaintiff, refusing to treat her equally during disciplinary proceedings unless she dismissed her racial discrimination charges, and intentionally transporting her to the wrong hospital when she was having a nervous breakdown); *Lay v. Roux Laboratories, Inc.*, 379 So.2d 451, 452 (Fla. 1st DCA 1980) (dismissing plaintiff's claim for intentional infliction of emotional

distress and finding that the alleged conduct was not sufficiently outrageous where plaintiff

alleges she was threatened with the loss of her job, where the defendant used humiliating

language, verbally attacked her, used racial epithets including calling plaintiff a "nigger."). Thus,

the Court also grants summary judgment on this claim.

### C.     Florida Whistleblower Act, Fla. Stat. 448.102 (Count IX)

Defendant also moves for summary judgment on Plaintiff's claim of retaliatory discharge

in violation of the Florida Whistleblower Act.  Section 448.102  provides that

> [a]n employer may not take any retaliatory personnel action against an employee because
> that employee has:
> (1) Disclosed, or threatened to disclose, to any appropriate governmental agency,
> under oath, in writing, an activity, policy, or practice of the employer that is in
> violation of a law, rule, or regulation. However, this subsection does not apply
> unless the employee has, in writing, brought the activity, policy, or practice to the
> attention of a supervisor or the employer and has afforded the employer a
> reasonable opportunity to correct the activity, policy, or practice.
> (2) Provided information to, or testified before, any appropriate governmental agency,
> person, or entity conducting an investigation, hearing, or inquiry into an alleged violation
> of a law, rule, or regulation by the employer.
> (3) Objected to, or refused to participate in, any activity, policy, or practice of the
> employer which is in violation of a law, rule, or regulation.

In analyzing Plaintiff's claim under the Florida Whistleblower Act, the court applies the burden-

shifting framework used for Title VII retaliation cases.  *Sierminski v. Transouth Financial Corp*.,

216 F. 3d 945, 950 (11th Cir. 2000).  "To prove a prima facie case a plaintiff must establish '(1)

that there was a statutorily protected participation; (2) that an adverse employment action

occurred; and (3) that there was a causal link between the participation and the adverse

employment action.'" *Padron v. BellSouth Telecommunications, Inc*., 196 F. Supp. 2d 1250, 1255

(S.D. Fla. 2002) (quoting *Bigge v. Albertsons, Inc*., 894 F. 2d 1497, 1501 (11th Cir. 1990)).   Once

a plaintiff meets her burden and demonstrates a prima facie case, the burden shifts to the

-25-

defendant to offer a reason unrelated to the statutorily protected participation for the adverse employment action. *See Cuddleback,* 381 F. 3dat 1235.  If a reason unrelated to the participation is offered, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext. *See id*.  Defendant argues that Plaintiff cannot meet her prima facie case because she cannot demonstrate that she engaged in statutorily protected activity and she cannot demonstrate that there was a causal link between her participation and any adverse employment action.  Defendant also argues that even if Plaintiff has met her prima facie case they have proffered a reason unrelated to her protected participation for her termination, and there is no evidence such reason is a pretext.  After careful consideration, the Court finds genuine issues of material fact remain.

First, the Court finds there are genuine issues of material fact with regard to whether Plaintiff can demonstrate that she engaged in statutorily protected participation.  Defendant argues that Plaintiff cannot demonstrate the required participation because "at no time did she threaten to report any such illegal activity to governmental authorities."  (D.E. No. 28 at 15).  This, however, is not required. Statutorily protected participation includes any situation where Plaintiff "objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation." Fla. Stat. § 448.102(3).  The evidence is legion  that Plaintiff objected to or refused to participate in certain activities of her employer because such activities were a violation of a law, rule, or regulation.  *See, e.g.*, (D.E. No. 34-1, Salazar Depo. at 37-44); (D.E. No. 35, Exh. 8 at 6, Exh. 17 at 4).  Thus, the Court will not grant summary judgment on this ground.

The Court also finds there are genuine issues of material fact with regard to whether

Plaintiff can demonstrate a causal link between her protected participation and her termination. As previously discussed, temporal proximity can sometimes demonstrate causation.  Specifically, "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart*, 231 F. 3d at 799.  Here, there is evidence in the record that Plaintiff wrote and gave a letter to her supervisor, Marks, three days before she was terminated. (D.E. No. 53, Exh. 17) (memo dated September 16, 2008); (D.E. No. 34-1, Salazar Depo. at 112-113) (D.E. No. 66, Joint Pretrial Stipulation at 4) (stating as an undisputed fact that Plaintiff was terminated on September 19, 2008).[23] In this letter, Plaintiff objects to the abuse and neglect that she saw in the nursing home and the failure of Marks and Meer to do anything about the abuses she reported.  (D.E. No. 53, Exh. 17 at 4).  Three days between a protected participation and a termination is sufficient to create a genuine issue of material fact as to this issue.

Finally, the Court also finds for the reasons discussed above relating to Plaintiff's civil rights claims that there are genuine issues of material fact with regard to whether Defendant's reasons for firing Plaintiff are a mere pretext. *See supra* section III(A)(1)(b).  Thus, the Court does not grant summary judgment on Plaintiff's claim alleging a violation of the Florida Whistleblower Act.

### D.     COBRA, 29 U.S.C. § 1166 (Count X)

Finally, Defendant argues that Plaintiff cannot establish that Defendant violated 29 U.S.C.

---

[23]Defendant disputes that this letter was given to Marks, but on summary judgment, the Court views all facts in the light most favorable to the non-moving party.

§ 1166.  Section 1166(a)(4)(A) requires a health plan administrator to notify a former employee of

her right to receive continuation of her health care coverage when particular events such as

termination occur. The Court acknowledges that Defendant has filed an affidavit from Jim

Williams ("Williams"), the president of Defendant's plan administrator during the relevant time,

in which he states that on November 3, 2008 his company "provided" Plaintiff with information

on how she could continue her healthcare coverage.  (D.E. No. 30-1 at ¶ 6).  Williams also states

without further explanation that he has "personal knowledge of the facts stated" in his affidavit.

*Id*. at ¶ 2.  In addition, attached to Williams's affidavit is an unsigned copy of a November 3, 2008

letter discussing Plaintiff's coverage continuation and Form 3877 from the U.S. Postal Service

indicating that something was sent to Plaintiff on November 5, 2008.  (D.E. Nos. 30-2, 30-3).  It is

however, unclear what was sent or who sent it as the sender's name and address was left blank on

Form 3877. In contrast, Plaintiff testified that "her health insurance was cancelled" and "[n]o

Cobra was offered and nothing."  (D.E. No. 34-1, Salazar Depo. at 142).

"It is a long established presumption that a letter properly addressed, stamped, and mailed

was received by the individual to whom the letter was addressed."  *Brown v. Neely Truck Line,*

*Inc*., 884 F. Supp. 1534, 1541 (M.D. Ala. 1995).  In addition, "[m]ere denial of receipt is

insufficient to rebut the presumption."  *Id*.  Here, however, the Court cannot find on the basis on

Williams's vague and conclusory affidavit that a letter was actually mailed to Plaintiff.  As stated

above, Williams merely states that notice was "provided" to Plaintiff and includes a form that

only indicates that something was sent to Plaintiff by someone.  *See* (D.E. No. 30-1 at ¶ 6); (D.E.

No. 30-3).  Moreover, the affidavit does not explain how Williams has personal knowledge of

these events.  It is unclear if Williams is trying to state that he mailed the letter himself or simply

that he thinks the letter was sent because that is the customary practice of his company.

Moreover, if it is the latter, Williams provides no explanation of the customary procedure of his

company.  Thus, because Defendant has not demonstrated that the presumption should apply,

Plaintiff's denial of receipt is sufficient to create a genuine issue of material fact with regard to

this claim, and the Court denies summary judgment on this count. *See Brown*, 884 F. Supp. at

1541 (stating that testimony that a plaintiff did not receive the notice "'standing alone'" is

"'sufficient to support a finding of non-receipt.'") (quoting *Phillips v. Riverside*, 796 F. Supp.

403, 408 (E.D. Ark. 1992)).  Thus, the Court finds summary judgment inappropriate on this claim.

**IV.    Motions to Strike**

Both parties have filed motions to strike certain documents filed in support of the motion

for summary judgment or filed in support of the response to Defendant's motion for summary

judgment.  The Court, however, denies these motions as moot as it found the documents the

parties wished to strike were not helpful to either party and neither aided the Court in granting

summary judgment nor prevented it from granting summary judgment.[24]  Therefore, it is hereby:

**ORDERED AND ADJUDGED** that

1.       Defendant, Delta Health Group, Inc.'s Motion for Summary Judgment (D.E. No.

28) is **GRANTED in part** and **DENIED in part**.  The motion is granted with respect to

Plaintiff's claims for hostile work environment, to the extent such are alleged in Counts II, III, IV,

V, and VI, with respect to Plaintiff's retaliation claims in Counts III and VI, and with respect to

---

[24]If Defendant believes particular documents contain information that is private and
should not be stated publicly in the Court record, Defendant may file a motion to seal specifically
identifying these documents and specifically explaining why and for how long these documents
should be sealed.  If the parties wish to seek sanctions for the filing of particular documents, a
separate motion must be filed.

Plaintiff's intentional infliction of emotional distress claim in Count VII.  The motion is denied in all other respects.   In addition, for the reasons stated above Count I is **DISMISSED with prejudice**.[25]

2.      Defendant Delta Health Group Inc.'s Motion to Strike "Affidavits" Filed by Plaintiff (D.E. No. 37), Plaintiff's Motion to Strike "Affidavit and Exhibits of Jim Williams" in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment (D.E. No. 46), Defendant Delta Health Group, Inc.'s Motion to Strike Portions of Carmen Telot's Affidavit filed by Plaintiff in Support of Response to Defendant's Motion for Summary Judgment (D.E. No. 60), and Defendant Delta Health Group, Inc.'s Motion to Strike Affidavit of Naira Padron Filed By Plaintiff in Support of Response to Defendant's Motion for Summary Judgment (D.E. No. 61) are **DENIED** as **MOOT**.

DONE AND ORDERED in Chambers at Miami, Florida, this 20 day of December, 2010.

_____
JOSÉ E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record

---

[25]  The following claims remain pending.  Counts, II, IV, and V remain pending with respect to Plaintiff's claims that she was discriminated against on the basis of her race (Counts II and V) or national origin (Count IV).  In addition, Counts VIII, IX, and X remain pending.